Hoover *v.* Pennsylvania Railroad Company,
Appellant.

Argued November 22, 1961. Before BELL, C. J.,
MUSMANNO, JONES, COHEN, EAGEN and ALPERN, JJ.

reargument refused January 30, 1962.

*Gordon W. Gerber,* with him *Wesley E. Forte,* and
*Barnes, Dechert, Price, Myers & Rhoads,* for appellant.

*Michael A. Foley,* for appellee.

OPINION BY MR. JUSTICE MUSMANNO, January 2, 1962:

The Phoenix Iron and Steel Company maintains a plant about one mile east of Harrisburg where it operates a small railroad whose tracks parallel the right of way of the Pennsylvania Railroad. On January 26, 1957, employees of the Phoenix company, under the direction of the freight conductor Frank J. Pilsitz, were shifting freight cars on the Phoenix tracks. A string of cars was being propelled forward by a diesel locomotive against a lone car for the purpose of attaching that car to the string. The joining coupler which was to effect the connection, failed to work and the lone car took off by itself as a result of the tremendous jolt it received in the unsuccessful fastening process. Since the brakes on this car had not been applied, it achieved a forceful momentum and, after traveling some 80 feet, rammed head-on into a lone gondola standing on the track, striking it with such violence that the gondola tilted from the perpendicular, its superstructure listing to such a degree that the upper part of the car filled almost completely the space between the Phoenix track and the Pennsylvania Railroad track, this space measuring 7 feet 3½ inches.

While all this was taking place, the famed Broadway Limited of the Pennsylvania Railroad was moving eastwardly from Harrisburg on its appointed run to New York, traversing the track next to the track harboring the leaning gondola. A gondola is a freight car without roof and with steel sides, having no resemblance whatsoever in shape, size or weight to its gossamer-weight namesake riding the canals of Venice.

The Phoenix freight conductor, Pilsitz, saw at once that the overhang of the gondola jeopardized the passage of the Broadway Limited. The thunder and the flash of this train already could be felt and Pilsitz whipped from his pocket a white card which he waved,

as he stood in the track over which the Broadway Limited, with its eighteen passenger cars, was advancing. The train had now reached a point known as Dock's Bridge, 814 feet east of the steel-ballasted marooned freight car.

In the locomotive of the Broadway Limited, the engineer saw the obstruction and threw on his emergency brakes, bringing the train to a stop with its front end some 140 to 210 feet beyond the reclining gondola and missing the sides of the derelict car by a scant inch and a half.

Although a crash was providentially averted, the incident was not without casualty. The passenger brakeman, Ray Griffith Hoover, who was riding in the last car of the Pennsylvania train, suddenly found himself, as the air brakes seized hold of the revolved wheels, picked up as if by a giant hand and hurled through the glass in the door of the observation car, sustaining serious injuries.

He brought suit against the Phoenix Iron and Steel Company charging it with common law negligence and against the Pennsylvania Railroad Company on a charge of liability under the Federal Employer's Liability Act. At the trial, all parties agreed that the plaintiff's injuries entitled him to a verdict of $50,000 and that Phoenix was negligent in the manner it allowed one of its cars to get away, strike and cripple the crucial gondola and thus produce a serious hazard on the main track of the Pennsylvania Railroad. The only pertinent question submitted to the jury was whether the railroad company was also negligent in company with Phoenix.

The jury found that it was. The verdict was affirmed by the court en banc and the railroad company appealed.*

---

* The verdict was affirmed by two of the court en banc. President Judge Hagan dissented and filed a dissenting opinion.

The railroad company contends that Phoenix was solely responsible for the accident, pointing out that although the top of the tilted gondola missed the locomotive of the Broadway Limited by only an inch and a half, no part of the car actually physically touched the rails of the Pennsylvania track and, as a consequence of this near miss, the electronic signal system was not activated. The Pennsylvania engineer thus had no way of knowing what lay ahead except by ocular observation, but as soon as he beheld the danger, he endeavored with all mechanical means at his disposal to stop the train immediately, that is, he applied the emergency safety system.

But Phoenix argues that, granting the necessity for stopping the train, there was no need to apply the emergency brakes with the precipitate stoppage, which catapulted Hoover through the glass partition in the rear car. Specifically, Phoenix contends that the Broadway Limited should have made a service stop instead of an emergency stop.

A witness for Phoenix testified that a regular service stop, with a train moving at 30 miles per hour, could be effected in 750 feet. A railroad witness, however, testified that a regular service stop required about 1000 feet whereas an emergency stop could be effected in 600 feet.

According to the argument of Phoenix, the engineer could have stopped his train within 64 feet of the obstruction if he had made a service stop at the appropriate time and place. There were physical characteristics in the topography at this point which made it impossible for the engineer to see the whole of the intervening distance of 814 feet. But, aside from this, the argument of Phoenix presupposes that the engineer could *instantaneously* measure the distance from Dock's Bridge to the gondola, that he knew the exact weight of every car in his train since weight has a bearing on speed and stoppage, and that he knew the

amount of wind pressure, the condition of the rails and all the other factors which go into determining whether to attempt a regular service stop or an emergency stop. To presuppose all this is to imagine that beneath the railroad cap and within the engineer's denims there rode a combined Einstein, expert surveyor and meteorologist. But even if the engineer had been this kind of a prodigy, would he still have been justified in using the service stop which would have brought him within 64 feet of disaster? Was it not his duty, charged as he was with the responsibility for the lives of the passengers in 18 cars, to effect a stop at the earliest possible moment?

The accident happened on January 26, 1957. The trial occurred in October, 1960. The attorneys and witnesses had three years and nine months within which to figure out the exact distances, speeds, and so on. Yet they would impose upon the engineer the responsibility of working out all these complex and intricate problems in the matter of two or three lightning seconds, while at the same time saying a prayer because the engineer believed that he would not clear the obstruction and that the steel car would strike the motor where he was sitting and crush in on his side, even possibly tilting the locomotive.

It appears that the fireman on the passenger train was attending to duties in the rear of the locomotive at the time the train was passing under Dock's Bridge. From this fact Phoenix argues that if the fireman had been at his window he would have seen the gondola when the train was 814 feet away or at some point closer than the point where the engineer saw it the first time. But even if the fireman had seen it at the time indicated and had communicated his observation to the engineer while the train traveled 64 feet, the duty still devolved upon the engineer to apply the emergency brakes.

It is clear that the cause of Hoover's injuries was exclusively the negligence of Phoenix and that, therefore, the judgment against the Pennsylvania Railroad must be reversed.

It is accordingly reversed, and judgment n.o.v. entered in favor of the Pennsylvania Railroad Company.